# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

BRENDA D. JONES,         )
                       )
     **Plaintiff,**        )
                       )
     v.               )     **CAUSE NO. 1:11-CV-00357**
                       )
MICHAEL J. ASTRUE,     )
**Commissioner of Social Security,**   )
                       )
     **Defendant.**      )

## OPINION AND ORDER

Plaintiff Brenda D. Jones appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Jones applied for DIB and SSI in 2006, alleging disability from June 24, 2006. (Tr. 15, 140-51.) Her claim was denied initially and upon reconsideration (Tr. 83-90, 94-107), and Jones requested an administrative hearing (Tr. 108). Administrative Law Judge ("ALJ") Terry L. Miller conducted a hearing on December 17, 2009, at which Jones, who was represented by counsel; Debi Sizemanor, Jones's case manager; and a vocational expert testified. (Tr. 15, 32-78.) At the hearing, Jones, through counsel, amended her alleged onset date to June 27, 2006.

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

(Tr. 15, 40.)

On February 22, 2010, the ALJ rendered an unfavorable decision to Jones, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 15-31.) The Appeals Council denied Jones's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)

Jones filed a complaint with this Court on October 11, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In her appeal, Jones argues that the ALJ improperly evaluated the opinions of her treating sources at Grant-Blackford Mental Health Center and Dr. Henry Martin, a consultative psychologist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 10-13.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Jones was forty-three years old (Tr. 24), had a high school education (Tr. 40), and had previously worked as a nurse aide and production line assembler (Tr. 237; *see* Tr. 40-42). Jones alleges that she became disabled as of June 27, 2006, due to migraine headaches with associated bilateral occipital neuritis; degenerative disc disease of cervical spine/cervical syndrome; history of hypertension; history of right shoulder injury; history of left renal artery stenosis that required stent placement/chronic kidney disease; schizoaffective disorder; bipolar disorder/depression; and generalized anxiety disorder/panic attacks. (Opening Br. 2.) Jones does not challenge the ALJ's findings with respect to her

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 579-page administrative record necessary to the decision.

2

physical impairments (Opening Br. 2 n.1); therefore, the Court will focus on the evidence pertaining to her mental limitations.

### B. *Jones's Testimony at the Hearing*

At the hearing, Jones testified that she lives in an apartment with her boyfriend and four-year-old son. (Tr. 38-39.) She is able to drive, but previously had her license suspended for driving under the influence of prescription medication. (Tr. 39-40, 60.) As for her mental impairments, Jones suffers from schizo-affective and bipolar disorders. (Tr. 53, 67.) Jones described her bipolar disorder as more depressive than manic; her depressed moods, during which she does not do anything (even shower), last for an average of eight or nine days at a time and occur every couple of months. (Tr. 67-68.) When she experiences mania, she gets really angry, which she stated happens "[a]ll the time." (Tr. 68.) Jones indicated that she has memory problems and concentration difficulties that include being easily distracted. (Tr. 53-55.) She further represented that she hears voices every day telling her "bad things," but that being on her medication helps, though it does not eliminate the voices. (Tr. 55.)

Jones receives treatment at Cornerstone, where she has been going since 2003. (Tr. 56.) Her case manager is Debi Sizemanor, and she had primarily seen Dr. Dennis Ugboma up until his departure. (Tr. 56.) She used to see a therapist once a month, but stopped a couple of months ago, reportedly because she lacked a car to get there. (Tr. 57.) Jones testified that this therapy did not really help, but that her medications—Invega, Neurontin, Effexor, and Trazodone—help with her schizo-affective disorder. (Tr. 58.) She reportedly still has trouble sleeping, even with Trazodone. (Tr. 66.)

According to Jones, her "biggest problem" is dealing with other people. (Tr. 58.) She

stated that she "just can't deal with other people" because she gets angry very easily. (Tr. 58-59.) Jones further testified that she does not know what mood she is going to be in so she usually does not go out and that she has no friends. (Tr. 59-60.) In crowded stores, Jones experiences very bad anxiety. (Tr. 59.) Jones admitted that she had problems with overusing prescription medications up until 2007. (Tr. 61.)

Jones stated that her typical day consists of waking up and taking her medications, waiting for them to kick in, and then laying down again because they make her sleepy. (Tr. 62.) She then gets up around eleven or twelve o'clock and eats something; "piddles around the house," doing some housework, putting away clothes, or cleaning the bathroom; and watches some television. (Tr. 62.) Jones reported that she can take care of her personal care needs, dust, and sweep, but that she only cooks "[o]nce in a while" because she gets distracted and will burn food. (Tr. 63-64.) She and her boyfriend go grocery shopping together every one to two weeks, and Jones does the laundry for her family at her mother's house. (Tr. 63-64.) As for her son, Jones stated that she watches programs and plays with him, cares for him, feeds him, and picks out his clothes. (Tr. 64-65.) She testified that her boyfriend pays the bills and keeps track of the money matters and that she probably could not do it if she had to.[3] (Tr. 65-66.)

*C. Summary of the Relevant Medical Evidence*

On June 30, 2006, Jones saw Dr. Dennis Ugboma at the Medication Clinic of Cornerstone Behavioral Health Center (hereinafter referred to as "Cornerstone") (Tr. 311), a division of Grant-Blackford Mental Health, where Jones had been treated since May of 2003 (*see* Tr. 312-45). Dr. Ugboma noted that Jones's diagnoses were bipolar disorder, NOS; anxiety

---

[3] Jones's case manager at Cornerstone, Debi Sizemanor, also testified at the hearing and essentially corroborated Jones's testimony. (Tr. 69-73.)

disorder, NOS; and polysubstance dependence in remission.  (Tr. 311.)  Jones reported difficulty

sleeping and occasional anxiety symptoms, but also an improvement in her depression and

decreased irritability.  (Tr. 311.)  She further denied any suicidal or homicidal ideation or any

hypomanic or manic symptoms.  (Tr. 311.)  Dr. Ugboma found her mental status exam

unremarkable.  (Tr. 311.)

Jones returned to Dr. Ugboma the following month.  (Tr. 310.)  She continued to

experience occasional sleep problems and anxiety symptoms, but still denied homicidal or

suicidal ideation or hypomanic or manic symptoms.  (Tr. 310.)  Dr. Ugboma noted again that her

mental status exam was unremarkable.  (Tr. 310.)  In August, Jones reported that her mood had

been fine and denied any depressive symptoms; her occasional sleep and anxiety problems

remained.  (Tr. 309.)  Her mental status exam was once again unremarkable.  (Tr. 309.)

Two months later, in October, Jones saw Dr. Ugboma again, reporting good sleep and

appetite and that her mood had been fine and denying any suicidal or homicidal ideation or any

hypomanic, manic, depressive, or psychotic symptoms.  (Tr. 308.)  She indicated that she had

occasional difficulties with irritability, but was coping well, and occasional anxiety symptoms;

she had not experienced a panic attack for three months.  (Tr. 308.)  Her mental status exam was

still unremarkable.  (Tr. 308.)  The next month, Jones called Cornerstone, requesting

medications.  (Tr. 307.)  Dr. Ugboma was made aware that Jones had been calling in early for

her medications, but prescribed them "at this time."  (Tr. 307.)

At the end of January 2007, Jones had another appointment with Dr. Ugboma.  (Tr. 366.)

Since her last visit, Jones had been feeling occasionally depressed, but was coping well with it

and did not feel that she needed medication intervention.  (Tr. 366.)  She further reported good

sleep and appetite and occasional irritability and anxiety symptoms, but denied suicidal or homicidal ideation, any recent panic attacks, or any psychotic symptoms. (Tr. 366.) Her mental status exam was again unremarkable. (Tr. 366.)

In February 2007, Henry Martin, Ph.D., performed a mental status examination of Jones at the request of the state agency. (Tr. 369-73.) Dr. Martin found her recent and remote memory intact, that she had insight into the nature of her problem, that she appeared to be of average intelligence, and that she had no unusual thought content. (Tr. 370.) Upon testing, Jones had difficulty interpreting proverbs and was unable to do serial 7s, recall more than one of three words given to her after a five-minute delay, or recall more than five digits forward or four digits backward. (Tr. 371.) As for her daily activities, Dr. Martin wrote that Jones spends most of the day playing with and caring for her two-year-old son, does all the cooking, and does laundry at her mother's house; she reported calling her mother ten to fifteen times a day. (Tr. 372.) Dr. Martin diagnosed her with bipolar I disorder, current episode depressed; generalized anxiety disorder, with panic attacks; and opioid abuse, in remission, and assigned her a Global Assessment of Functioning ("GAF") score of 50.[4] (Tr. 372.)

Later that same month, Kenneth Neville, Ph.D., a state agency psychologist, reviewed Jones's file and completed a RFC assessment. (Tr. 374-91.) Dr. Neville concluded that Jones was moderately limited in her abilities to understand and remember detailed instructions; carry

_____

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.*

out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 388-89.)  When explaining his assessment, Dr. Neville noted that Jones displayed the ability to cook, do laundry, care for her child, shop, and drive.  (Tr. 390.)  He further stated that no medical opinion was given.  (Tr. 390.)  Dr. Neville then opined that although Jones was somewhat irritable and impulsive, she retained the capacity for necessary work-related interaction with peers and supervisors as well as the cognitive capacity to comprehend and carry out simple instructions and carry out simple, repetitive tasks in a competitive setting.  (Tr. 390.)  A second state agency psychologist later affirmed this assessment.  (Tr. 428.)

At the end of March 2007, Dr. Ugboma saw Jones again; she stated that she had been feeling occasionally depressed since her last visit and that three weeks before she had felt depressed daily for about a week without any specific stressors.  (Tr. 433.)  Jones also reported continued sleep and irritability difficulties, but denied any suicidal or homicidal ideation, hypomanic or manic symptoms, psychotic symptoms, or appetite difficulties.  (Tr. 433.)  Dr. Ugboma observed that her mental status exam was unremarkable.  (Tr. 433.)

A month later, Jones related to Dr. Ugboma improved energy since starting Wellbutrin and good sleep and appetite, but occasional depression, irritability, anger, and anxiety attacks.  (Tr. 432.)  Her mental status exam was still unremarkable.  (Tr. 432.)  By the end of May, Jones told Dr. Ugboma that she had been feeling increasingly depressed over the last week, had been

denied SSI, and was experiencing financial difficulties. (Tr. 431.) She further reported increased anxiety symptoms despite her current medications. (Tr. 431.) On mental status exam, Dr. Ugboma noted that Jones demonstrated a constricted affect and was tearful. (Tr. 431.)

In July, Jones informed Dr. Ugboma that her mood had improved since her last visit and was now "relatively fine" and not depressed. (Tr. 470.) She reported difficulties sleeping at night, but that she was coping better with recent stressors and was in a relationship, which had been helpful. (Tr. 470.) She still experienced occasional anxiety symptoms, but found her medications helpful. (Tr. 470.) Her mental status exam was unremarkable. (Tr. 470.)

When Jones saw Dr. Ugboma again in September, she had discontinued three of her medications a month before because she felt like they were not benefitting her mood. (Tr. 469.) Nonetheless, she still remained depressed and further reported irritability and anger problems. (Tr. 469.) Moreover, her anxiety symptoms had increased and she had been isolating herself from social situations and public settings. (Tr. 469.) On mental status exam, Jones displayed a constricted affect. (Tr. 469.) A diagnosis summary completed this same month included diagnoses of opiate dependence, alcohol dependence, and bipolar disorder. (Tr. 476.) Her GAF score at admission was a 49; a current GAF score was apparently unknown. (Tr. 476 (where a question mark follows Jones's "current GAF" score).)

The following month, Jones indicated to Dr. Ugboma that her mood had improved and she felt less depressed, but that she was still experiencing increased irritability and anger and sleep difficulties. (Tr. 468.) Dr. Ugboma once again found her mental status exam unremarkable. (Tr. 468.) In December, Jones reported that she was doing relatively well until two weeks ago, when she began feeling "somewhat depressed"; she had ended a relationship

around this same period. (Tr. 467.) Jones stated that over the past several weeks, she had been experiencing auditory hallucinations, which were critical in nature and lasted several minutes. (Tr. 467.) She denied visual hallucinations or other psychotic symptoms. (Tr. 467.) On mental status exam, Jones had a constricted affect. (Tr. 467.) By January of 2008, Jones reported daily auditory hallucinations and rated her depression as an 8 out of 10. (Tr. 466.) She further related that she was still experiencing anxiety symptoms and constantly felt tense, but denied any anxiety attacks or suicidal or homicidal ideation. (Tr. 466.) Dr. Ugboma again observed that she had a constricted affect. (Tr. 466.)

In March 2008, Jones went to the crisis intervention center because she was hearing voices. (Tr. 477.) Although she refused to be admitted inpatient, she was evaluated. (Tr. 477, 479.) On mental status exam, her mood/affect was flat and tearful, her thought content was paranoid, her recent memory was impaired, and she was experiencing auditory, command hallucinations and suicidal ideation. (Tr. 479.) Her current GAF score was a 53. (Tr. 480.) Dr. Ugboma saw Jones on this same day. (Tr. 464.) Jones stated that, since her last visit, she had been experiencing auditory hallucinations that were command in nature and getting worse. (Tr. 464.) She denied visual hallucinations, paranoid delusional thought pattern, or suicidal or homicidal ideation; although her auditory hallucinations were telling her to hurt herself, she did not feel like she would act on it. (Tr. 464.) She further indicated that her anxiety symptoms had increased and she felt depressed. (Tr. 464.) A week later, Jones saw Dr. Ugboma again, reporting that her mood had improved since starting Abilify, her auditory hallucinations and anxiety symptoms had decreased, and she felt less depressed. (Tr. 464.) Her mental status exam was unremarkable. (Tr. 463.)

At her next appointment with Dr. Ugboma in August of 2008, Jones related that she had ran out of her medications three weeks before, but, before that, had discontinued two of them. (Tr. 484.) Since then, she had been experiencing auditory hallucinations and feeling increasingly depressed. (Tr. 484.) She also reported increased anxiety symptoms and occasional anxiety attacks. (Tr. 484.) At the same time, Jones denied visual hallucinations, paranoid delusional thought pattern, any suicidal or homicidal ideation, or any hypomanic or manic symptoms. (Tr. 484.) Dr. Ugboma observed a constricted affect upon mental status exam. (Tr. 484.)

By the end of November, when Jones saw Dr. Ugboma again, her auditory hallucinations remained, but had decreased in intensity and frequency. (Tr. 483.) She still denied visual hallucinations, but reported mild paranoid delusional thought pattern. (Tr. 483.) She also had occasional difficulties with irritability and occasional episodes of tearfulness and depression, but denied any anger problems or suicidal or homicidal ideation. (Tr. 483.) Jones continued to report occasional anxiety problems and attacks, but indicated her current medications had been helpful. (Tr. 483.) Dr. Ugboma found her mental status exam unremarkable. (Tr. 483.)

In March of 2009, Jones returned to Dr. Ugboma, still complaining of auditory hallucinations and mild paranoid delusional thought pattern, but denying visual hallucinations or suicidal or homicidal ideation. (Tr. 532.) She continued to experience anxiety symptoms, an occasional anxiety attack, and episodes of tearfulness and depression. (Tr. 532.) Dr. Ugboma again found her mental status exam unremarkable. (Tr. 532.)

Dr. Ugboma next saw Jones three months later, in June 2009. (Tr. 543.) Jones reported that, since her last visit, she had been in jail for nine days after she was involved in a motor vehicle accident with her son. (Tr. 543.) According to Jones, on the day of the accident, she had

taken more of her medications than prescribed; she insisted that she had not abused any substances prior to that day. (Tr. 543.) Because of this incident, her Medicaid was cut, her son was placed in the custody of her ex, and she was kicked out of her apartment; she was currently residing with her boyfriend. (Tr. 543.) Jones described her mood as depressed and reported occasional sleep problems, but denied any irritability or anger difficulties. (Tr. 543.) She was experiencing increased anxiety, occasional anxiety attacks, auditory hallucinations, and some mild paranoid delusional thought pattern. (Tr. 543.) On mental status exam, she demonstrated a constricted and tearful affect. (Tr. 543.)

In November 2009, Jones returned to the medication clinic; this time, she saw Tammy Bradford, a psychiatric nurse. (Tr. 540.) She had not been on any medication since losing Medicaid, but had recently gotten back on Medicaid and wished to continue her medications. (Tr. 540.) She described hearing voices, which, according to Ms. Bradford, sounded more related to mood rather than actual psychosis. (Tr. 540.) Her mental status exam was remarkable only for constricted affect. (Tr. 540.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000). Where the Commissioner's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, the case must be remanded." *Brindisi ex rel.*

*Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative

record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A),

1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),

1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On February 22, 2010, the ALJ rendered his decision. (Tr. 15-31.) At step one of the analysis, the ALJ found that Jones had not engaged in substantial gainful activity since her alleged onset date. (Tr. 17.) The ALJ then concluded at step two that Jones suffered from the following severe impairments: migraine headaches with associated bilateral occipital neuritis; degenerative disc disease of cervical spine/cervical syndrome; history of hypertension; history of right shoulder injury; history of left renal artery stenosis that required stent placement/chronic kidney disease; schizo-affective disorder; bipolar disorder/depression; generalized anxiety disorder/panic attacks; and history of polysubstance dependence (mainly opioid abuse) currently in remission. (Tr. 17.) Nonetheless, at step three, the ALJ determined that Jones's impairment

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

or combination of impairments did not meet or medically equal a listing. (Tr. 17-19.) Before

proceeding to step four, the ALJ determined that Jones's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not entirely credible (Tr. 20) and assigned

her the following RFC:

> [T]he claimant has the residual functional capacity to perform "light" work . . .
> except for the following additional limitations: that she cannot perform overhead
> work with her dominant right upper extremity and she cannot work around bright
> lights and loud noises. In addition, the claimant is limited to unskilled work. She
> can perform simple routine tasks that do not involve fast-paced production work,
> more than occasional changes in the work setting, more than simple work-related
> decisions, or more than brief and occasional interactions with others.

(Tr. 19).

Moving onto step four, the ALJ found that Jones was unable to perform any past relevant

work. (Tr. 24.) At step five, however, the ALJ determined that Jones could perform a

significant number of jobs within the economy, including officer helper, stock checker, and

housekeeper/cleaner. (Tr. 25.) Thus, Jones's claims for DIB and SSI were denied. (Tr. 26.)

### C. The ALJ's Consideration of the Opinions from the Cornerstone Sources and Dr. Martin Are Supported by Substantial Evidence

Jones argues that the ALJ improperly discounted the opinions of both her treating sources

at Cornerstone and Dr. Martin, a consultative psychologist, for essentially the same reasons,

which she claims are not supported by substantial evidence. Ultimately, Jones's challenges to

the ALJ's consideration of theses sources are unavailing.

At Cornerstone, Jones primarily saw Dr. Dennis Ugboma. Although neither Dr. Ugboma

nor anyone else from Cornerstone gave a medical opinion regarding Jones's mental RFC or a

medical source statement, they sometimes assigned her GAF scores of less than 50. (*Compare*

Tr. 243 (assigning a current GAF of 49 in February 2006), 249 (assigning an admission and

lowest GAF of 40 in May 2005), *and* 476 (assigning an admission GAF of 49 in September 2007), *with* Tr. 480 (assigning a GAF of 53 in March 2008).) Since her alleged onset date, Jones was assigned two GAFs by Cornerstone staff—a GAF of 49 at admission, but no current GAF, in September 2007 (Tr. 476) and a current GAF of 53 in March 2008 (Tr. 480). The ALJ, in considering all of these GAF scores, acknowledged that Jones "was sometimes assigned GAF scores of less than 50," but found that "overall, the records from [Cornerstone] *since the amended alleged onset date* do not support such low GAF scores." (Tr. 21 (emphasis added).)

Similarly, when Dr. Martin performed a mental status examination of Jones at the request of the state agency in February 2007, he assigned Jones a GAF score of 50. (Tr. 372.) The ALJ found that this GAF score was inconsistent with Dr. Martin's findings on the mental status exam—which were within normal limits except for Jones's difficulty interpreting proverbs and inability to do serial 7s or recall more than one of three words given to her after a five-minute delay or more than five digits forward or four digits backward—and given Jones's report that she was able to care for her two-year-old son, cook, do laundry, and care for her personal needs. (Tr. 21.) The ALJ then concluded that "a GAF score of just 50 is not representative of [Jones's] mental condition for the majority of time since June 2006." (Tr. 21.)

First, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [her] GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *see Thomas v. Astrue*, No. 2:11-cv-188-PRC, 2012 WL 2130582, at *7 (N.D. Ind. June 12, 2012) ("[A] GAF score alone is not determinative of disability."); *Curry v. Astrue*, No. 3:09-CV-565 CAN, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for

assessing treatment options rather than determining functional capacity and a person's disability."). And although these "scores may assist in formulating the claimant's residual functional capacity," *Adams v. Astrue*, No. 1:06-CV-393 RM, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009), they do "not reflect the clinician's opinion of functional capacity," *Denton*, 596 F.3d at 425.

Nevertheless, here, although not required to do so, the ALJ explicitly referenced the low GAF scores in the record and articulated reasons for finding that the record did not support these scores. (*See* Tr. 21); *see Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." (citations omitted)). Specifically, as to the GAFs assigned by Cornerstone, the ALJ pointed to Jones's lack of inpatient treatment and her largely unremarkable mental status examination findings since her alleged onset date and her ability to care for her young child as being inconsistent with these low GAF scores. (Tr. 21.) The ALJ discounted Dr. Martin's GAF of 50 for essentially the same reasons—Dr. Martin's relatively normal findings when examining Jones and Jones's ability to care for her son and her personal needs, cook, and do laundry. (Tr. 21.)

But the ALJ did not stop his analysis there. Once he recounted the records from Cornerstone and Dr. Martin's exam, the ALJ turned to the opinion of the state agency psychologists, who assessed Jones's mental RFC and found that, despite her mental impairments, she could still do simple routine tasks. (Tr. 21.) As the ALJ noted, besides the GAF scores of 50 or less, this is the only medical opinion of record on Jones's mental condition (Tr. 21);

moreover, it is the only mental RFC assessment in the record.  The ALJ was entitled to rely on

the opinion of the state agency psychologists, "particularly where no physician imposed any

greater functional limitations than those found by the ALJ in [his] RFC determination."

*Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011); *see Rice*

*v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (holding that the ALJ did not err in relying on

opinions from state agency consultants where there was "no doctor's opinion contained in the

record which indicated greater limitations than those found by the ALJ"); 20 C.F.R. §§

404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants and

other program physicians and psychologists are highly qualified physicians and psychologists

who are also experts in Social Security disability evaluation.").

     And the ALJ resolved any conflict between the state agency psychologists' opinion and

the GAF scores of 50 or less in the record, stating the following:

>  [N]ot only are these GAF scores not supported by the records from the mental health
> sources who assigned these scores to [Jones], they are also inconsistent with the
> medical evidence overall, including her lack of inpatient treatment for a psychiatric
> reason since June 2006.  In addition, they are also not consistent with the claimant's
> ability to live outside of a highly supportive living arrangement, to care for her
> young child, and to perform basic activities of daily living on a largely independent
> basis.

(Tr. 21); *see Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (explaining that when the

record contains conflicting medical evidence, the ALJ has an affirmative responsibility to

resolve that conflict).  Accordingly, the ALJ also discounted the low GAF scores because of

internal inconsistencies between these scores and the records from Cornerstone and the findings

of Dr. Martin's exam and because they were inconsistent with the medical evidence overall, both

of which are permissible reasons for discounting opinions.  *See Ketelboeter v. Astrue*, 550 F.3d

620, 625 (7th Cir. 2008) (noting that an ALJ can discount a treating physician's opinion if it is internally inconsistent); *Zblewski v. Astrue*, 302 F. App'x 488, 493-94 (7th Cir. 2008) (unpublished) (affirming the ALJ's discounting of a nurse's opinion where it was inconsistent with the medical evidence of record); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Despite this explanation, however, Jones takes issue with three of the ALJ's reasons for finding the low GAF scores inconsistent with the record—Jones's lack of inpatient treatment, her largely unremarkable mental status exam findings, and her ability to care for her young son and perform other daily living activities. (*See* Opening Br. 10-13.)

As to the first reason, Jones argues that the ALJ did not explain *how* her lack of inpatient treatment was inconsistent with GAF scores of less than 50. (Opening Br. 10.) But the ALJ is required only to articulate, at least at some minimal level, his analysis of the evidence to allow this Court to trace the path of his reasoning and conduct an informed review. *Zurawski*, 245 F.3d at 888. Here, the Court is able to do so. Although a GAF score between 41 and 50 does not *require* inpatient treatment or hospitalization, inpatient treatment would arguably provide support for such a GAF score, as a score in that range may be characterized by serious symptoms, such as suicidal ideation, that could necessitate hospitalization. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000) (stating that a GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)).

As such, Jones's lack of inpatient treatment, which was just one of the reasons the ALJ

gave for finding the low GAF scores unsupported by the record, can support the ALJ's discounting of these scores. Although the ALJ could have done a better job explaining this particular reason, "no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *see also Susalla v. Astrue*, No. 1:11-CV-00164, 2012 WL 2026268, at *10 (N.D. Ind. June 5, 2012) (finding that, despite the fact that the ALJ's reasoning in one respect was lacking, "because the ALJ provided several other 'good reasons' to discount [a psychiatrist's] opinion, this misstep falls short of warranting a remand of the ALJ's decision").

Furthermore, Jones asserts that the ALJ "played doctor" by failing to cite any medical reason why hospitalization is necessary to show that an individual is disabled due to mental conditions. (Opening Br. 10; Reply Br. 1.) According to the Seventh Circuit Court of Appeals, cases requiring reversal because an ALJ impermissibly "played doctor" are ones in which the ALJ failed to address relevant evidence, *Dixon*, 270 F.3d at 1177; *see, e.g.*, *Clifford*, 227 F.3d at 870 (reversing because ALJ disregarded treating physician's opinion that the claimant had arthritis without citing any conflicting evidence in the record), or when the ALJ drew medical conclusions himself about a claimant without relying on medical evidence, *see, e.g.*, *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). Moreover, an ALJ who rejects the medical opinions of record and then constructs his own RFC without supporting medical evidence also impermissibly plays doctor. *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006).

Jones relies on *Myles* in support of her argument. (Opening Br. 10.) The ALJ in *Myles*,

582 F.3d at 677-78, discounted the claimant's diabetes, absent any medical evidence, because it was not treated with insulin therapy, improperly inferring that insulin was not prescribed because the claimant was not experiencing significant problems.  Here, rather than, as Jones argues, using Jones's lack of hospitalizations since her alleged onset date to conclude that she was not disabled or to discount her mental impairments (*see* Opening Br. 10), which the ALJ found were severe (Tr. 17), the ALJ used this lack of inpatient treatment as simply one reason why the low GAF scores assigned by Cornerstone were not supported by their own records, the medical evidence overall, or Jones's daily activities such that the GAFs were discounted (*see* Tr. 21).  The ALJ is permitted to consider the course of treatment that Jones was prescribed in determining the weight to assign to an opinion, which includes whether Jones was admitted for inpatient treatment.  *See Thomas v. Astrue*, No. 1:11-cv-00355, 2012 WL 5183574, at *7 (N.D. Ind. Oct. 18, 2012); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (articulating that the ALJ may consider "the treatment the source has provided and the kinds and extent of examinations and testing the sources has performed or ordered from specialists and independent laboratories" when deciding the weight to assign to a medical opinion).  Therefore, although the ALJ could have better articulated this reason for finding the low GAF scores unsupported by the record, a remand is not warranted on this basis, particularly when the ALJ adequately articulated his other reasons for reaching this conclusion.

Next, Jones challenges the ALJ's conclusion that Jones's mental status examinations were largely unremarkable since her alleged onset date, which he then used as one reason for finding the low GAF scores unsupported by the record.  (Opening Br. 10-12.)  Specifically, Jones argues that the ALJ selectively discussed Jones's mental status exams, ignoring frequent

significant findings such as a constricted affect or anxiety symptoms.  But a review of the record reveals that the ALJ was correct when he described her mental status exam findings as "largely unremarkable."  As a matter of fact, since Jones's alleged onset date, Dr. Ugboma observed that her mental status exam was "currently unremarkable" on twelve separate occasions.  (Tr. 308-11, 366, 432-33, 463, 468, 470, 483, 532.)  On the other hand, Dr. Ugboma and other Cornerstone staff noted remarkable findings only eight times, which mostly consisted of a constricted affect or tearfulness.  (Tr. 431 (constricted affect and tearfulness in May 2007), 466-67 (constricted affect in December 2007 and January 2008), 469 (constricted affect in September 2007), 479 (a flat, tearful affect, paranoid thought content, thoughts of suicide, and auditory command hallucinations in March 2008 when Jones was evaluated at the crisis intervention center), 484 (constricted affect in August 2008), 540 (constricted affect in November 2009), 543 (constricted and tearful affect in June 2009).)  The ALJ explicitly mentioned these findings, stating that Jones's "[m]ental status examination findings since the amended alleged onset date were generally within normal limits, except for tearfulness and abnormal affect at times."  (Tr. 21.)

And although the ALJ did not mention every single complaint that Jones made to Dr. Ugboma or every one of Dr. Ugboma's findings, the ALJ is not required to mention every snippet of evidence in the record; rather, he must connect the evidence to the conclusion without ignoring entire lines of contrary evidence.  *Arnett v. Astrue*, 676 F3.d 586, 591 (7th Cir. 2012); *see Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ certainly considered the treatment notes from Dr. Ugboma and others at Cornerstone, explicitly mentioning a significant portion of them and acknowledging evidence that was contrary to his conclusion, such as Jones's complaints of hallucinations and paranoia.  (*See* Tr. 20-21); *cf. Diaz*, 55 F.3d at 307 (stating that

"[a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required"). Similarly, the ALJ mentioned Dr. Martin's findings from his mental status examination of Jones in February 2007, noting that his findings were within normal limits except that Jones had difficulty interpreting proverbs and could not do serial 7s or recall more than one of three words after a five-minute delay or more than five digits forward or four digits backward. (Tr. 21.) Accordingly, the ALJ reviewed the record fairly and connected the evidence to his conclusion *without* ignoring entire lines of contrary evidence. *Arnett*, 676 F.3d at 591; *see Herron*, 19 F.3d at 333.

Jones also attacks the ALJ's next reason for finding the low GAF scores unsupported by the record—that Jones was able to care for her young son and perform basic activities of daily living—arguing that, once again, the ALJ selectively discussed the record and ignored evidence that Jones needed help with her child and was very limited in her functioning outside of the home. (Opening Br. 12.) First, while the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," assigning some weight to such activities is appropriate. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Here, the ALJ did not improperly equate Jones's ability to take care of her child and do other household tasks to an ability to do work in the labor market. *See Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005) (remanding partly because of the ALJ's "casual equating of household work to work in the labor market"). Rather, the ALJ used this as merely one reason why the record did not support the low GAF scores.

Moreover, although the ALJ does not explicitly mention everything that Jones's mother,

Barbara Jones, reported about her daughter's daily activities (*see* Tr. 187-97, 203-13) or Jones's own statements concerning her activities and ability to take care of her son, the ALJ need not, once again, mention or make a written evaluation of every snippet of evidence in the record. *Arnett*, 676 F.3d at 591; *Dixon*, 270 F.3d at 1176; *see generally Rice*, 384 F.3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). Nonetheless, the ALJ cited to both of Barbara's third party function reports, suggesting that he considered all of this evidence, and found parts of Barbara's testimony to be "generally credible," including Barbara's reports that Jones could prepare meals, care for her infant and her own personal needs, do laundry, clean the house, and drive, and other parts not entirely credible, such as Barbara's statements that Jones had memory problems and difficulties completing tasks and understanding and following instructions.[6] (Tr. 19-20.) The ALJ also recounted Jones's report to Dr. Martin that she was able to care for her two-year-old son, cook, do laundry, and care for her personal needs, which provided further support for the ALJ's conclusion that she could live outside of a highly supportive arrangement, care for her young child, and perform basic activities of daily living on a largely independent basis. (Tr. 21.)

And, contrary to Jones's assertions (Opening Br. 12-13), the ALJ did consider Jones's reports of fatigue, anger problems, and depressive moods. (Tr. 20 ("The claimant further testified . . . that she gets angry very easily, . . . that she naps for a couple of hours during the day, . . . that she does not do anything at all (even shower) when she is depressed, and that her

---

[6] Jones does not challenge the ALJ's determination of her mother's credibility and, as such, this argument is waived. *See, e.g., Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the court in a response to a summary judgment motion are deemed waived).

episodes of depression happen every couple of months and last eight or nine days long.").)

Although the ALJ refers to her testimony at the hearing rather than her disability report, which includes Jones's statement that her mother took care of her child during these depressive periods (Tr. 222), this hardly amounts to a failure to consider an entire line of evidence, particularly when Jones confirmed at the hearing that she could care for her son, feed him, pick out his clothes, and play with him (Tr. 65). And, like her mother, the ALJ found some portions of Jones's testimony credible and other portions not entirely credible (Tr. 19-20), a determination Jones does not challenge. *See, e.g.*, *Palmer*, 327 F.3d at 597-98. It is not this Court's role to reweigh the evidence. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Accordingly, as the ALJ considered the important evidence, a remand is not warranted on this basis either.

In considering the medical opinions of record, adequately articulating the weight he assigned to them, and resolving any conflict between them, the ALJ fulfilled his duties in assigning Jones's RFC, which he bears the final responsibility for deciding. *Lane v. Astrue*, No. 1:10-CV-28 JD, 2011 WL 3348095, at *11 (N.D. Ind. Aug. 3, 2011); *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-5p, 1996 WL 374183. Furthermore, overall, his discounting of the low GAF scores in the record is supported by substantial evidence. Ultimately, Jones's challenges amount simply to a plea to reweigh the medical source evidence in the hope that it will come out in her favor this time, which the Court cannot do. *See Cannon*, 213 F.3d at 974 (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Jones.

SO ORDERED.

Enter for this 22nd day of January, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge